# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBENSON J. | : |
| | : |
| Petitioner, | :     Civ. No. 20-5141 (KM) |
| | : |
| v. | : |
| | : |
| THOMAS DECKER, *et al*., | :     **OPINION** |
| | : |
| Respondents. | : |
| | : |

**<u>KEVIN MCNULTY, U.S.D.J.</u>**

## I.    INTRODUCTION

Petitioner, Robenson J.,[1] is an immigration detainee currently held at the Hudson County Correctional Facility, in Kearny, New Jersey. He has filed, through counsel, a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (DE 1.) Presently before the Court is Petitioner's Motion for a Temporary Restraining Order ("TRO") which seeks his immediate release from detention. (DE 2.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. Because there has been an opportunity for full briefing and presentation of facts, with multiple updates by both sides, and because all of the similar applications before me have been decided on the papers, with no party requesting a hearing, I will treat the TRO application as one for a preliminary injunction. For the reasons set forth below, a preliminary injunction will be granted. This decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case.

---

[1]     Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

## II.      BACKGROUND

**A.      COVID-19**

On March 11, 2020, the World Health Organization officially declared COVID-19 a pandemic. *See* Ctrs. for Disease Control and Prevention, *Situation Summary*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last visited May 21, 2020). In only a few short months since that declaration, the rapidly spreading virus has infected more than 1,551,000 people in the United States and resulted in over 93,000 deaths. *See* Ctrs. for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 21, 2020).

This infectious disease is spreading "very easily and sustainably between people." *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html   (last visited May 21, 2020). It spreads "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces." *See id.* The Centers for Disease Control and Prevention ("CDC") has identified certain groups of individuals who are deemed to be at "higher risk for severe illness" if they contract COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 21, 2020). These high risk individuals include, but are not limited to, those who are over 65 years of age, have asthma, or suffer from serious heart conditions. *See id.*

For those in correctional and detention facilities, the virus presents "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments[.]" *See* Ctrs. for Disease Control and Prevention,

2

*Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 21, 2020). This close proximity heightens the potential that COVID-19 will spread. *See id.* Moreover, the "ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations." *See id.* The stark reality is that "avoiding exposure to COVID-19 is impossible for most detainees and inmates." *Cristian A.R. v. Decker*, Civ. No. 20-3600, 2020 WL 2092616, at *2 (D.N.J. Apr. 12, 2020).

It is against this backdrop that Petitioner filed his habeas petition.

**B.     Background**

*i.     Procedural History*

Petitioner is a 45-year-old native and citizen of Haiti. (DE 13-6 at 4.) He has been a Lawful Permanent Resident of the United States since November 1995. (*Id.*) His sister and father are United States citizens, his mother is a Legal Permanent Resident, and Petitioner himself has four United States citizen children. (DE 17-2 at 3.)

Petitioner has received several convictions over the years, beginning in 2002. (DE 13-7; DE 13-8.) These offenses include, but are not limited to driving while intoxicated, contempt of court, second-degree criminal contempt, second-degree harassment, second-degree strangulation, second-degree assault, and third-degree assault. (DE 13-8.)

On September 20, 2017, Petitioner was taken into custody by Immigration and Customs Enforcement ("ICE") and served with a Notice to Appear which charged him with removability. (DE 13-6 at 9.) Petitioner was charged as removable under 8 U.S.C. § 1227(a)(2)(A)(iii) as: (1) a non-citizen who sustained a conviction for an aggravated felony as defined in 8 U.S.C.

§ 1101(a)(43)(F); and (2) a non-citizen who sustained a conviction for an aggravated felony (a 2016 conviction for attempted assault) as defined in 8 U.S.C. § 1101(a)(43)(U). (*Id.*) He has remained in detention since that time.

In November 2017, Petitioner filed a motion to terminate his removal proceedings, arguing he had not committed an aggravated felony which would make him removable. (DE 13-9 at 2.) He also filed an application for relief under the Convention Against Torture. (*Id.* at 3.) On July 25, 2019, an Immigration Judge ("IJ") denied Petitioner's request for relief and ordered him removed from the United States. (*Id.* at 8.) The Board of Immigration Appeals ("BIA") affirmed the IJ's decision and Petitioner became subject to a final order of removal under 8 U.S.C § 1231(a). (DE 13-10.) On February 13, 2020, Petitioner filed a Petition for Review and a Motion for a Stay of Removal before the United States Court of Appeals for the Second Circuit. *See Joseph v. Barr*, No. 20-565, ECF No. 1 (2d Cir. 2020). The Second Circuit has not yet ruled on Petitioner's Motion for a Stay and his case remains pending. *See generally id.*

On April 27, 2020, Petitioner filed the instant habeas petition pursuant to 28 U.S.C. § 2241. (DE 1.) He separately filed a motion for a TRO. (DE 2.) He seeks release from custody based upon allegedly unconstitutional conditions of confinement and inadequate medical care. (DE 3.) On April 29, 2020, Respondents filed opposition to the petition and Petitioner thereafter filed a reply. (DE 13; DE 17.) Respondent and Petitioner have each also filed supplemental submissions. (DE 26; DE 27; DE 28; DE 29.)

### ii.     *Petitioner's Health*

Petitioner states that he suffers from hypertension and has struggled with breathing difficulties since he was a child. (DE 3 at 9; DE 17-2 at 1.) Petitioner also states, and his medical records confirm, that he has been prescribed medication to treat his hypertension. (DE 17-2 at 1;

DE 14-5 at 2.) As evidence of his medical diagnoses, Petitioner presents the declarations of Dr. Robert Greifinger who reviewed Petitioner's medical records from HCCF. (DE 1-1; DE 17-1; DE 27-1.) Dr. Greifinger states that Petitioner indeed suffers from hypertension, as well as mild to moderate asthma. (DE 17-1 at 1–2; DE 27-1 at 1.) Dr. Greifinger further provides that, in his professional opinion, Petitioner's hypertension places him at high risk for serious complications if he contracts COVID-19. (*Id*.) Dr. Greifinger opines that although Petitioner's asthma is "a cause of concern," Petitioner's medical records are inconclusive about the severity of his asthma. (*Id.*) Thus, Dr. Greifinger's opinion about Petitioner's risk for serious illness from COVID-19 is based solely upon Petitioner's hypertension diagnosis. (*Id.*) Dr. Greifinger avers that the "only way to effectively protect [Petitioner] from severe illness or death is to release him." (DE 27-1 at 3.)

Respondents dispute Petitioner's medical conditions. (DE 26.) Specifically, Respondents contend that Petitioner's medical records fail to demonstrate that he has ever been diagnosed with asthma or that he suffers from a "serious heart condition." (*Id.* at 1.) Respondents provide the declaration of Dr. Ralph Woodward, who is the Managing Physician at HCCF. (DE 26-1.) Dr. Woodward asserts that Petitioner's blood pressure "has been elevated for an insufficient period of time for it to be labeled as essential hypertension" and that there is nothing in Petitioner's medical records which indicate that he suffers from a "serious heart condition as a result of episodic, elevated blood pressure." (*Id.* at 2.) Dr. Woodward states that HCCF does not consider Petitioner at high risk for serious illness or death due to COVID-19 and Petitioner's "medical conditions, including his hypertension, can be managed appropriately at HCCF." (*Id.*)

## C.    Conditions at HCCF

### i.    *Respondents' Evidence Regarding the Conditions at HCCF*

To describe the measures HCCF has implemented to combat the spread of COVID-19, Respondents provide the declaration of Ron Edwards, the Director of the Hudson County Department of Corrections and Rehabilitation. (DE 28-1.) Mr. Edwards states that since March 2020, HCCF has taken various measures to ensure the health and safety of detainees during the COVID-19 outbreak. (*Id.* at 3.) Each housing unit is now on a "Restrictive Schedule" which only permits detainees outside of their cells for two 30-minute periods per day. (*Id.*) These 30-minute recreation periods have been staggered so that only two detainees are permitted to leave their cell area at a time, in order to allow room for social distancing. (*Id.* at 7.) Detainees "do not mingle during recreation time." (*Id.*)  The recreation areas are being "cleaned continuously during a 16-hour period during the day." (*Id.* at 3–4.) Housing units are sanitized no less than three times per day. (*Id.* at 4.) Detainees are provided with two bars of soap each, but additional soap is available upon request. (*Id.* at 9.) Detainees also have unlimited access to water and are provided with disinfectant wipes. (*Id.*) All detainees have also been provided with surgical masks, and all staff have been provided with Personal Protective Equipment. (*Id.* at 7, 11.)

HCCF has suspended all tours, volunteer services, and visitation. (*Id.* at 5–6.) Any facility, staff members, or vendors coming into HCCF must have their temperatures screened by a medical professional prior to entering the facility. (*Id.* at 5.) Anyone with a temperature over 100 degrees Fahrenheit is not permitted to enter. (*Id.*) Staff and detainees have also been advised on best practices to prevent the spread of COVID-19, including the importance of hand washing. (*Id.*) HCCF has posted CDC and Department of Health posters with this information throughout the facility. (*Id.*)

HCCF has established a designated housing unit as a quarantine area for detainees who are suspected of having, or who have tested positive for, COVID-19. (*Id.* at 6.) Medical personnel are

visiting each cell twice a day to check on every detainees' medical and mental health. (*Id.* at 7.) Meals are provided to detainees within their cells so that they do not congregate for mealtime. (*Id.* at 8.) HCCF staff are encouraging inmates and detainees to avoid congregating. (*Id.* at 8.)

HCCF is following guidance issued by the CDC and World Health Organization ("WHO"), as well as local guidelines, on testing and treatment for COVID-19. (*Id.* at 8.) Detainees who exhibit symptoms consistent with COVID-19 are evaluated "immediately" and any detainee who feels symptoms can make daily sick calls as needed. (*Id.*) A detainee may make a sick call "via tablet or to a nurse that comes in the unit twice a day." (*Id.*)

If a detainee tests positive for COVID-19, but does not require hospitalization, he will be isolated in a designated isolation area with other individuals who have tested positive. (*Id.*) Detainees' vitals are monitored daily and they are evaluated for hospital placement. (*Id.* at 8–9.) Detainees who are symptomatic and awaiting test results are placed in quarantine, where they remain for 14 days. (*Id.* at 9.) Individuals who are asymptomatic but have been exposed to someone with confirmed COVID-19, are housed together in a practice referred to as "cohorting." (*Id.*) If, after fourteen days, no new cases develop, cohorting is discontinued. (*Id.*) Any detainees with health conditions identified by the CDC as placing them at higher risk of developing serious illness of COVID-19 are being housed separately. (*Id.* at 11.)

As of 1:00 p.m. on May 17, 2020, 17 detainees have tested positive for COVID-19; 27 county and federal inmates have tested positive; and 97 staff members have tested positive. (*Id.* at 10.) Tragically, five HCCF staff members have died from complications due to COVID-19. (*Id.*) Approximately 41% of inmates and detainees and 34% of HCCF law enforcement officers who have been tested for COVID-19 have tested positive. (*Id.* at 10.)

ii.    *Petitioner's Evidence Regarding the Conditions at HCCF*

With regard to the conditions Petitioner is currently experiencing at HCCF, he provides his own declaration. (DE 17-2.) Petitioner states that he shared a cell with another individual, until that individual became infected with COVID-19 and was "taken away." (*Id.* at 3.) Petitioner is now housed by himself. (*Id.*) Petitioner states that detainees are permitted to leave their cells in small groups for one-and-a-half hours each day, but that the common areas are not cleaned between each group. (*Id.* at 2.) He contends that the common areas are actually "not cleaned very often." (*Id.*) Petitioner states that detainees use socks to touch the phones because they have not been provided with any products to clean high touch surfaces. (*Id.*) Although the officers have disinfectant wipes, only "if the officer is nice" will he provide them to the detainees. (*Id.* at 3.) Other officers refuse to hand out disinfectant wipes, indicating that the wipes are "only" for the officers (*Id.*)

Petitioner states that he is usually provided with two bars of soap per week. (*Id.*) However, as recently as April 29, 2020, Petitioner had not been given soap for over two weeks. (*Id.*) Petitioner has also never been provided hand sanitizer. (*Id.*) He received one mask and one pair of gloves, but "only some" detainees have received such items. (*Id.* at 2.)

Petitioner avers that he "care[s] a lot about keeping [his] surroundings clean," but that he has difficulty maintaining cleanliness. (*Id.* at 3.) Although Petitioner has asked for a mop to clean his cell, he has not been provided with one. (*Id.*) Instead, he uses a napkin or one of his shirts to attempt to clean his cell. (*Id.*) While Petitioner indicates that there is a cleaning company that comes to the facility, he states they only clean the officers' bathroom and the hallways. (*Id.* at 2.) Petitioner has never seen them clean the common areas or the detainees' bathrooms. (*Id.*) Petitioner

states that the communal showers are particularly dirty. (*Id.*) The bottom of one shower has allegedly turned black and has mosquitos. (*Id.*)

As further evidence of the conditions at HCCF, Petitioner also provides the declarations of attorneys at The Bronx Defenders, and The Legal Aid Society who have interacted with recently detained individuals at HCCF. (DE 1-3; DE 1-5.)[2]  These declarations indicate that detainees are having difficulty accessing prompt medical attention, personal hygiene products, disinfectant, and cleaning supplies. (DE 1-3 at 3–4; DE 1-5 at 2–3.) The declarations also suggest an inability of detainees to adhere to CDC guidelines such as social distancing, hand washing, and cleaning of high touch surfaces. (DE 1-3 at 3–4; DE 1-5 at 4.) Petitioner also submits the declaration of an attorney at the Health Justice Program at New York Lawyers to the Public Interest who delineates the problems that inmates and detainees have had accessing medical care at HCCF in the past. (DE 1-4.)

## III.   JURISDICTION

Generally, conditions of confinement claims are brought pursuant to 8 U.S.C. § 1983. *See Camacho Lopez v. Lowe*, Civ. No. 20-563, 2020 WL 1689874, at *4–5 (M.D. Pa. Apr. 7, 2020). However, where an individual seeks "immediate or more speedy release," he is asserting a remedy available through a habeas petition. *See Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973). A habeas petition is the process by which an individual may challenge the "fact or length" of his confinement. *See id.* To date, the United States Supreme Court has not expressly stated whether a conditions of confinement claim may be raised through a habeas corpus petition. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [individuals] might be able to challenge their confinement conditions via a petition for a writ of habeas

---

[2]    To the extent that this declaration contains hearsay, a court may consider hearsay evidence at this preliminary stage. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004).

corpus."); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). However, federal courts of appeals appear to have condoned such challenges. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Moreover, recent caselaw within this circuit has been largely consistent in finding that an immigration detainee may challenge the conditions of his confinement through a § 2241 petition. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases). Given these considerations, I agree with the line of cases that have permitted conditions of confinement claims to proceed through a habeas petition and find that Petitioner may pursue his claims through the present petition.[3]

## IV.   LEGAL STANDARD

To obtain a temporary restraining order or a preliminary injunction, a petitioner must provide a "threshold" showing of two critical factors: (1) a likelihood of success on the merits of his claim; and (2) that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). A likelihood of

---

[3]     I also note that under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that this custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek § 2241 relief only in the district in which he is in custody. *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). Thus, this Court has jurisdiction over Petitioner's claims as he is detained within this district and alleges that his detention violates the Constitution.

success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). If these two "gateway factors" are met, then the Court considers the remaining two factors which aim to balance the equities of the parties: "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." *Id.* at 176 (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The Court considers, "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

## V.    DISCUSSION

Petitioner argues that his continued detention violates his substantive due process rights under the Fifth and Fourteenth Amendments. (DE 1 at 20.) His cause of action arises under two separate theories: (1) that the conditions of his confinement are impermissibly punitive, and (2) that HCCF is being deliberately indifferent towards his serious medical needs. (DE 3 at 28–30.) Based upon the particular circumstances presented in this case, I find that Petitioner has met the standard for a TRO.

## A.    Likelihood of Success on the Merits

### i.    *Conditions of Confinement Claim*

Petitioner argues that the Government is subjecting him to unconstitutionally punitive conditions of confinement. (DE 3 at 28.) Specifically, Petitioner contends that the conditions at HCCF are "highly dangerous" because of virulence of the COVID-19 outbreak and the fact that

detainees cannot access basic hygiene or cleaning products to thwart the spread of the virus. (*Id.* at 25–26.) Petitioner submits that his detention under these circumstances is not reasonably related to any legitimate governmental objective, especially considering the other means by which ICE can monitor him. (*Id.* at 27.) Respondents maintain, however, that HCCF has undertaken significant measures to prevent the spread of COVID-19. (DE 13 at 16–20.) They argue that Petitioner's allegation that he lacks adequate access to basic hygiene products such as soap and disinfectant wipes "does not square" with Mr. Edwards' declaration. (*Id.* at 17.) Further, Respondents argue that Petitioner's continued detention is reasonably related to the Government's interest in protecting the public, particularly given Petitioner's criminal history. (DE 13 at 20.)[4]

An immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth Amendment. *See Sharkey*, 928 F.3d at 306–07 (holding that immigration detainees are entitled to the "same due process protections" as pretrial detainees). Under the Fifth Amendment's Due Process Clause, "a detainee may not be punished prior to an adjudication of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). In order to determine whether a challenged condition amounts to punishment, a court looks at whether that condition "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

---

[4]      Respondents argue that Petitioner is properly detained pursuant to 8 U.S.C. § 1231(a) and that his detention is mandated through the pendency and conclusion of his removal proceedings. (DE 13 at 14–16.) Petitioner asserts, however, that the statutory basis for his detention is "irrelevant" to his due process claims. (DE 17 at 12 n.3.) I agree with Petitioner that the fact of his authorized detention does not negate his argument that the conditions of his confinement may be unconstitutional, requiring conditions of release during the COVID-19 crisis. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the same due process protections as pretrial detainees).

Whether a condition of confinement is reasonably related to a legitimate government objective turns on whether the condition serves a legitimate purpose and is rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A petitioner can demonstrate that a challenged condition amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," *or* if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

In the emerging case law that has developed within this district, courts have emphasized certain key factors in determining whether an immigration detainee's conditions of confinement amount to punishment during the current pandemic: namely, the detainee's health and the specific conditions at the facility at which he is detained. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020)*; Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *8 (M.D. Pa. Apr. 27, 2020); *Rafael L.O. v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843, at *7-8 (D.N.J. Apr. 9, 2020). In the absence of guidance from the Supreme Court or the Courts of Appeals regarding how to handle conditions of confinement claims during a pandemic, "many courts have found that insufficient jail action in light of the virus can serve as a basis for release . . . while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted." *Cristian R. v. Decker*, Civ. No. 19-20861, 2020 WL 2029336, at *2 (D.N.J. Apr. 28, 2020).

Here, I find that Petitioner has demonstrated a likelihood of success on the merits. As the Third Circuit has held, a likelihood of success requires a showing "significantly better than negligible but not necessarily more likely than not." *See Reilly*, 858 F.3d at 179. Although

Respondents dispute the severity of Petitioner's medical conditions, Petitioner has submitted competent evidence that he suffers from hypertension, a condition recognized by the CDC as placing him at higher risk for severe illness if he contracts COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 21, 2020); *see also Anthony W. v. Anderson*, Civ. No. 20-3704, 2020 WL 2121118, at *3, 10–11 (D.N.J. Apr. 17, 2020) (releasing petitioner who suffered from hypertension where conditions of confinement left petitioner unable to protect himself from COVID-19); *Cristian A.R. v. Decker*, Civ. No. 20-3600, 2020 WL 2092616, at *3, 12–14 (D.N.J. Apr. 12, 2020) (same). Even Dr. Woodward's declaration appears to confirm that Petitioner does have some form of hypertension. (DE 26 at 2 (stating that Petitioner's medical conditions, "*including his hypertension*, can be managed appropriately at HCCF") (emphasis added).) Moreover, Petitioner's medical records reflect that he is actively being treated for high blood pressure, as evidence by his prescriptions. (DE 14-4 at 107, 180.)

Petitioner has also demonstrated that, despite the best intentions and efforts of HCCF to follow CDC guidelines and protocol, he is unable to adhere to the measures touted by the CDC as the best way to prevent contracting COVID-19. While Petitioner is currently housed by himself, he must still share common areas. Petitioner states that these common areas are not cleaned frequently enough and that detainees have not been provided with cleaning supplies to disinfect high touch surface areas. (DE 17-2 at 2–3.) Additionally, Petitioner indicates that he has gone for long periods of time without receiving soap and that he has never been provided with hand sanitizer. (*Id.*) I cite to these facts not in criticism of HCCF's laudable measures, but rather to indicate that detainees may still face issues adhering to CDC guidelines.

I do not find that Respondents have an intent to punish Petitioner. Indeed, as I have previously recognized in other cases, I find that HCCF has enacted sincere and substantial measures to prevent the spread of COVID-19. *See Durel B. v. Decker*, Civ. No. 20-3430, 2020 WL 1922140, at *8 (D.N.J. Apr. 21, 2020); *Leandro R. P. v. Decker*, Civ. No. 20-3853, 2020 WL 1899791, at *7 (D.N.J. Apr. 17, 2020); *Jeferson V. G. v. Decker*, Civ. No. 20-3644, 2020 WL 1873018, at *8 (D.N.J. Apr. 15, 2020). Yet, the COVID-19 pandemic is a difficult and unparalleled time and jails were "not designed with pandemics in mind." *Sergio S.E v. Rodriguez*, Civ. No. 20-3982, 2020 WL 2111029, at *6 (D.N.J. May 4, 2020).

Despite the commendable efforts by HCCF, it unfortunately seems that the danger to this Petitioner remains great. In measuring the danger, I do not find it critical to resolve disputes of fact about the availability of soap, etc. I am more moved by the results: the fact that despite precautions, there have been a large number of cases at HCCF. Some 17 detainees have tested positive, one in the last week; 97 staff members, out of a total of 350 (284 were tested), have tested positive. Five persons, all of them staff members, have died of COVID-19. The danger, then, remains high and there is no strong evidence that is subsiding or has subsided. My decision here rests primarily on Petitioner's medical condition and the danger of serious illness or death that he faces if infected.

I recognize that the Government has a legitimate objective in detaining this Petitioner during his removal proceedings and in protecting the public. However, given Petitioner's medical vulnerability and the present conditions at HCCF, I find that Petitioner's conditions of confinement are excessive in relation to the purpose of his detention. *See Bell*, 441 U.S. at 538. This is especially true given the other alternatives available to ICE to achieve their objectives. *See Thakker v. Doll*, Civ. No. 20-480, 2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020) ("We note that ICE has a plethora of means *other than* physical detention at their disposal by which they may monitor civil

detainees and ensure that they are present at removal proceedings, including remote monitoring and routine check-ins." (emphasis in original)). Accordingly, I find that Petitioner has met the first factor for the grant of a TRO.

ii.     *Inadequate Medical Care Claim*

Petitioner argues that Respondents have demonstrated a deliberate indifference towards his serious medical needs by failing to take adequate steps to protect high risk individuals in their custody. (DE 3 at 29–31.) Petitioner asserts that Respondents refusal to acknowledge that he is at high risk for severe complications due to COVID-19 demonstrates their deliberate indifference to the risk that the virus poses to Petitioner. (DE 17 at 13.) Respondents maintain, however, that Petitioner does not have a serious medical need, but even if he did, he is still unable to demonstrate HCCF has been deliberately indifferent to that need. (DE 13 at 20–21.) Respondents cite to the numerous steps HCCF has taken to prevent the spread of COVID-19 and to treat individuals who may have been exposed to the virus. (*Id.* at 21.)

The applicable legal standard for an immigration detainee's inadequate medical care claim is that of deliberate indifference. *See Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)); *see also Camacho Lopez v. Lowe*, Civ. No. 3:20-CV-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020). To succeed on a claim of inadequate medical care, a petitioner must show: (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582. The Supreme Court has held that an official demonstrates deliberate indifference where "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

16

Here, HCCF has enacted significant measures to prevent the spread of COVID-19. They have undertaken efforts to permit social distancing, increase general cleaning of the facility, monitor detainees' physical and mental health each day, and provide ongoing medical treatment, including testing, to detainees who exhibit symptoms consistent with COVID-19. (DE 26-2.) Indeed, Petitioner's medical records reflect that after his former cellmate tested positive for COVID-19, he was also tested for COVID-19, the results of which came back as negative. (DE 14-4 at 146; DE 26-1 at 2.) Moreover, Petitioner's records reveal that he has been seen every week in April, often several times per week, either for various ailments or to have his temperature monitored. (DE 14-4; DE 14-5.) Although there may not yet be a perfect solution to protect individuals from contracting this infectious disease, Respondents' actions do not demonstrate that they have recklessly disregarded the serious threat that COVID-19 poses. Thus, I find that Petitioner has not demonstrated a likelihood of success on the merits of his deliberate indifference claim.

Although Petitioner has failed to show a likelihood of success on the merits of his deliberate indifference claim, he has still demonstrated a likelihood of success on his conditions of confinement claim. Therefore, I find that Petitioner has met the first factor required for the grant of a TRO.

## B.     Irreparable Harm

The second threshold showing Petitioner must make in order to be granted a TRO is that he is "more likely than not" to suffer irreparable harm absent the relief requested. *See Reilly*, 858 F.3d at 179. Petitioner argues that given his medical vulnerability and the inability of HCCF to stem the outbreak of COVID-19, he faces a serious risk of illness or death if he remains detained. (DE 17 at 15–16.) Conversely, Respondents argue that Petitioner cannot demonstrate irreparable

harm because he has not substantiated his purported medical condition of hypertension. (DE 13 at 22.)

As I have already found, Petitioner has submitted competent evidence that he suffers from an underlying health condition which places him at higher risk for severe illness or death if infected. (DE 27-1); *see* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 21, 2020). I have also found that Petitioner appears unable to practice adequate hygiene or avoid coming into contact with high touch surfaces that are not adequately cleaned while detained at HCCF.  Although there is currently no guarantee against contracting COVID-19, correctional and detention facilities present "unique challenges for control of COVID-19 transmission[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 21, 2020). Within facilities such as HCCF, detainees cannot practically adhere to measures which have been "touted as the most effective means to thwart the spread of the virus." *Rafael L.O.*, 2020 WL 1808843, at *8. The continuing rise in the number of cases at HCCF underscores this point. Therefore, based upon the record presently before the Court, I find that Petitioner has demonstrated that he is more likely than not to face irreparable harm if his confinement at HCCC continues.

## C.   Balancing of the Equities

Finally, I consider the remaining two factors which aim to balance the equities of the parties: the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. Petitioner argues that the public has an overwhelming interest in minimizing the spread of COVID-19 and in avoiding the additional burdens he would place on the

healthcare system if he were to become seriously ill. (DE 3 at 40.) He asserts that Respondents'
countervailing interest in his physical detention is also weakened in light of the conditions of
release that may be imposed to address Respondents' concerns. (*Id.* at 41–42.) Although
Respondents do not specifically address the public interest, I glean from their opposition that they
believe the public interest weighs in favor of detaining Petitioner, especially considering his
criminal history. (DE 13 at 20.)

Here, there exists a possibility of serious harm to Petitioner if he becomes infected with
COVID-19. There also exists a significant public interest in releasing Petitioner before he contracts
COVID-19 in order to "preserve critical medical resources and prevent further stress on the states'
and country's already overburdened healthcare system." *Cristian A.R.*, 2020 WL 2092616, at *13;
*see also Thakker v. Doll*, 20-480, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020) ("Given the
highly unusual and unique circumstances posed by the COVID-19 pandemic and ensuing crisis,
the continued detention of aging or ill civil detainees does not serve the public's interest." (internal
quotation marks and citation omitted)). Petitioner states that, if released, he will reside in his
father's home where he will be able to self-isolate. (DE 17 at 18.) Petitioner's pastor, who is a
licensed physician, will also be able to provide Petitioner with free medical services including
check-ups and medication for his health conditions. (*Id.*)

At the same time, I recognize that Respondents have a legitimate interest in enforcing
immigration laws, ensuring Petitioner does not abscond, and protecting the public. I am cognizant
of the Petitioner's criminal record. I also recognize, however, that he has been a legal resident for
25 years, that he has strong family ties, that stringent conditions of release can be imposed, that he
has an application to bar deportation pending, and that he now has every incentive to avoid trouble
with the authorities.

Thus, in considering each parties' interests and the interests of the public, I believe Respondents' and Petitioner's concerns can be appropriately balanced by releasing Petitioner to strict conditions of release including home confinement and electronic and telephonic monitoring. The specific conditions of his release are set forth in the Order accompanying this Opinion.[5] Accordingly, I find that the balancing of the equities weighs in favor of granting a TRO.

## VI.    CONCLUSION

For the foregoing reasons, a preliminary injunction will be granted. An appropriate Order accompanies this Opinion.

DATED: May 21, 2020

/s/ Kevin McNulty

_____

KEVIN MCNULTY
United States District Judge

---

[5]    Respondents' answer requests the opportunity to suggest conditions of release if the Court is inclined to grant such release. (DE 13 at 25.) Petitioner will be released on the conditions outlined in the accompanying Order. If modification is sought, counsel should attempt to agree, but if there is no such consent, the court will entertain letter applications for modification of conditions of release.